J-A19001-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL J. DUNCAN, | |
| Appellant | No. 541 WDA 2012 |

Appeal from the Judgment of Sentence Entered March 2, 2012
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0000357-2011

BEFORE:  BENDER, P.J.E., OLSON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:              **FILED OCTOBER 30, 2014**

Appellant, Michael J. Duncan, appeals from his sentence of life imprisonment[1] imposed following his conviction for first degree murder and criminal conspiracy.  Appellant presents numerous questions for our review.  However, we conclude that Appellant has waived all his claims due to his failure to comply with Pa.R.A.P. 1925(b)(4).  Accordingly, we affirm.

The trial court summarized the facts adduced at trial as follows:

John Lynn Newman ("Newman") was shot to death on February 3, 2003, in California, Pennsylvania.  On January 24, 2012, a jury found that Newman's death was the result of a conspiracy and/or solicitation between John Ira Bronson, Jr. ("Bronson") … and his co-defendant at trial, [Appellant].  Any

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant was also sentenced to a consecutive term of 15–30 years' incarceration.

complete summary of the facts for the intervening nine years must begin with the circumstances that led to this conspiracy and/or solicitation.

In 2002, Newman was approached by the PSP [(Pennsylvania State Police)] and informed "that he had been investigated and [that] felony drug charges against him [were] pending." In October of that year, Trooper Aaron Borello ("Trooper Borello") approached Newman about becoming a confidential informant ("C.I.") for the PSP. Trooper Borello and Newman then set about performing a buy/bust involving Newman's supplier, Bronson. After Bronson was observed selling 200 pills of Oxycodone to Newman, he was arrested. The PSP searched Bronson's home and found about $384,000 in cash which was seized.[1]

---

[1] Bronson eventually pled guilty to drug trafficking and was incarcerated.

---

After his arrest, Bronson began acting as a C.I., first with the PSP and then for the Federal Bureau of Investigation ("F.B.I."). While working with the PSP, Bronson asked Trooper Borello directly if it was Newman who had informed on him. Unfortunately, Bronson's participation as a C.I. was fruitless and ended "within a week" prior to Newman's death.

At some point after Bronson's arrest, [Appellant] spoke with his associate, Howard Irwin ("Irwin"), about another man, "[Michael] Bowman ("Bowman"), having some type of hookup where he [could] make some money … taking care of [an unnamed] snitch." Irwin then witnessed, at his home, a meeting between [Appellant], Bronson, and Bowman, a drug dealer and associate of Bronson. During the meeting, Bronson asked [Appellant] to kill Newman and [Appellant] agreed. Bronson asked Bowman to cooperate in the killing, but Bowman declined.

Prior to Newman's death, Robert Bedner ("Bedner") called Brian Dzurco ("Dzurco"). Phone records revealed that the call occurred on January 20, 2003, about two weeks before the death of the victim. Bedner put Bronson on the phone with Dzurco, who asked Dzurco to set up a meeting with Newman. Dzurco agreed because he believed the matter to be related to a drug debt. After receiving information that the meeting might

be fatal for Newman, Dzurco chose not to arrange it. Shawn Geletei ("Geletei") testified that, while in jail, [Appellant] approached him and bragged about his intention to murder Newman. He recalled that the conversation was prior to Newman's death. Geletei specifically testified:

> [Appellant] come over and asked if I knew Newman. I said, yeah. He says, I'm going to take his ass out. And he started saying something about Bronson and drugs and all this. I said, I'm only in here [in jail] for child support, I don't want to get involved in this. And he kept on running his mouth saying about him being a monster and taking people out before and all this.

Through phone records and witness testimony, the following timeline of February 3, 2003, being the day of the killing, was revealed:

At 7:32 p.m.[,] a call was made from Newman's cell phone to Brian Horner ("Horner"), which lasted 3 minutes and 19 seconds. Sometime before 8:00 p.m.[,] Newman asked his wife for $300.00, ostensibly for cartons of cigarettes, but was, most likely, to buy heroin. At 7:56 p.m.[,] a call was made from Newman's cell phone to Horner, which lasted 1 minute and 9 seconds. Sometime after receiving the money, Newman left the house. He met Geletei in the alley between their houses to discuss acquiring Oxycodone. Geletei told Newman that he could not locate any Oxycodone. Newman told Geletei that he was going to meet Horner.

Upon returning home, Newman informed his wife that Horner needed a ride and he left again. At 8:08 p.m.[,] Newman called a drug client named Amelia Pajerski ("Pajerski"). At approximately 8:30 p.m.[,] Newman sold Pajerski stamp bags of heroin. He told Pajerski that the heroin was from Horner. Pajerski specifically recalled being home in time to watch a favorite show by 9:05 p.m. At approximately 9:00 p.m.[,] Newman's daughter heard the distinctive sound of her father's car pass by their house. At 9:03 p.m.[,] Newman called Geletei's landline, which lasted for 6 seconds. Thereafter, Newman was killed by a bullet fired at close range while he was sitting in his car, which was parked down the street from his home.

Next, the record reveals the events of February 4, 2003, as follows: Early in the morning, Newman's daughter noticed his car

parked down the street from their house. She observed her father inside the car, but the car door was locked. Upon returning to the car with Mrs. Newman, they found the victim dead and contacted the authorities. The police searched the scene and located a spent bullet casing inside the car, and an unfired cartridge outside of the vehicle. Newman had $115.00 in cash, a marijuana "roach", a cell phone, and ten packets of heroin. Around 12:00 p.m.[,] Ryan Givens called [Appellant] to inform him that Newman had been killed, to which [Appellant] responded, "snitches get dealt with." The authorities took Horner in for questioning and tested his hands for gunshot residue. The results allowed the tester to state "that [Horner] could have fired a gun, could have come in contact with something that had gunshot primer residue on it," or "that [Horner] was in very close proximity to a firearm when it was discharged."

It took several years for charges to be filed in this "cold case[."] The relevant events of the years are summarized herein:

In March, 2003, Irwin asked [Appellant] to wire money to him while on vacation. The money, being $931.00, was transferred on March 10, 2003. Also in early March, [Appellant] appeared early one morning at the home of his drug associate, Gerald Hull ("Hull"). Hull's home was used to cook and store crack cocaine. [Appellant] opened a safe located within the Hull residence, to which only he and Irwin had access. At that time, [Appellant] was heard making a call. The exact nature of the call was unclear. However, Hull, who was admittedly high on crack at the time, recalled hearing [Appellant] speak about shooting someone. [Appellant], who appeared "giddy, nervous, [and] agitated," pointed a gun in Hull's face before leaving.

When Irwin later returned from vacation, he discovered that [Appellant] had "disappeared[."] Irwin f[ound] that the safe had been emptied. The safe's contents, being money, drugs and a nine millimeter (9 mm) pistol, were missing, and only a cell phone was left behind.

In April of 2003, while on furlough, Bowman spoke with [Appellant], who told Bowman that he killed Newman, and explained the manner in which he did it. [Appellant] told Bowman that he was in the rear of Newman's car and shot him in the left ear. Between April and June of 2003, Bowman had a

- 4 -

three-way call with a woman and [Appellant]. Again, [Appellant] admitted that he killed Newman.[2]

_____

[2] The Court notes that the testimony regarding this call was elicited from Bowman on cross-examination. Defense counsel asked Bowman "you are saying … that [Appellant] made a three-way call in a recorded jail call where he goes, yeah, that's right, I killed that guy; is that what you are saying to the jury?" Bowman answered "That's exactly what I'm telling the jury."

_____

In September of 2003, PSP Trooper James Monkelis ("Trooper Monkelis") and Trooper Beverly Ashton ("Trooper Ashton") interviewed [Appellant]. He denied having ever been in California, PA, and denied knowing Newman. When told of Newman's death, [Appellant] said that he did not "whack" him, despite not being told the nature of Newman's death.[3] [Appellant] also identified Newman as a snitch. Newman's role as a C.I. had not been released to the public. [Appellant] made other inculpatory statements, such as:

1. Stating that "hypothetically" someone, implying Newman, owed someone else, implying Bronson, a lot of money.

2. Stating that he could not do the time and worrying that he would rather not be 45, 46 or 46, 47 at the clubs."

3. In response to the interviewer stating that it might have been self-defense, he stated "come on, man, you seen that crime scene, it couldn't have been self[-]defense."[4]

_____

[3] The Court notes that it was public knowledge that Newman had been killed.

[4] The Court notes that no crime scene photos had been released at the time of the interview.

_____

In late 2003, a former corrections officer, Eric DeLong ("DeLong"), encountered [Appellant] in a bar. DeLong overheard [Appellant] state, "yeah, I popped that guy in the

back of the head [in] California." A few days later, DeLong reported this incident to the PSP, who put him in touch with the FBI. Despite this report, DeLong "didn't hear anything for, approximately, seven years."

Approximately two and a half years after Irwin first discovered that [Appellant] had fled California, PA, he finally spoke to [Appellant]. When Irwin asked [Appellant] why he had left California, PA, [Appellant] gave his reasons, admitting to killing Newman and also to Horner's involvement. [Appellant] told Irwin that "Brian Horner was running [Appellant's] name about being involved in the homicide and [Horner] was actually the one that ... brought [Newman] out [of] the house and … brought him to the car. And [Appellant] was in the car and [Appellant] whacked [Newman]." [Appellant] went on to tell Irwin that he "whacked," or killed, Newman because he was a "snitch".

In January 2011, [Appellant] was arrested in Amherst, Ohio. He was interviewed again by Trooper Monkelis[,] and again made inculpatory statements. He stated that "snitches get dealt with." He stated that "he never owned or carried that caliber of a weapon."[5] After the interview, [Appellant] was transported back to Pennsylvania. [Appellant], while en route, spoke in further detail about his views on snitches, saying that even "God doesn't like snitches."

In August of 2011, Bronson was housed in the Washington County Correctional Facility ("WCCF") in connection with being charged in this case. In December of 2011, Bronson admitted to Michael McCarthy, a fellow inmate, that he attended the 2002 meeting with [Appellant] and Bowman at Irwin's house. He admitted that the meeting concerned "offing[,"] or killing, Newman. McCarthy then reported the conversation to the authorities.

_____

[5] The Court notes that the caliber of the weapon was never released.

Trial Court Opinion (TCO), 3/26/13, at 3-8 (internal citations omitted).

The charges against Appellant were initiated by a Washington County

Grand Jury Presentment dated December 8, 2010. The Presentment

recommended that the Commonwealth charge Appellant, Bronson, and Irwin for their participation in a conspiracy to kill Newman. On January 13, 2011, the Commonwealth charged Appellant with first degree murder and criminal conspiracy. Appellant filed numerous pre-trial motions on September 22, 2011, and the Commonwealth filed a motion to consolidate the three pending cases against Appellant, Bronson, and Irwin on September 30, 2011. Following argument held on October 21, 2011, the trial court issued an order on October 25, 2011, granting the Commonwealth's motion to consolidate. Following a hearing and argument held on October 27, 2011, the trial court issued an order, dated October 31, 2012, denying and/or granting all then-pending defense motions.[2]

Irwin reached an agreement with the Commonwealth prior to trial, permitting him to plead guilty to a lesser charge in exchange for his testimony against Appellant and Bronson. His plea was entered on December 14, 2011. On January 11, 2012, a jury trial for Appellant and Bronson commenced. The jury reached a verdict on January 24, 2012, finding Appellant guilty of first degree murder and criminal conspiracy. On March 2, 2012, the trial court sentenced Appellant to a mandatory term of life imprisonment for first degree murder, and a consecutive term of 15-30

_____

[2] Additional defense motions were filed on January 12, 2012, seeking suppression of Appellant's recorded statements. That motion was denied on January 14, 2011.

years' incarceration for criminal conspiracy. Appellant did not file any post-sentence motions. He filed a timely notice of appeal on March 22, 2012.

The trial court ordered Appellant to file a Rule 1925(b) concise statement of errors complained of on appeal (concise statement) on April 2, 2012. Appellant's trial counsel was granted two continuances to file a concise statement. Appellant's counsel was then permitted to withdraw his representation of Appellant by order dated August 22, 2012. In that same order, the trial court appointed Jeffrey Watson, Esq., to file a Rule 1925(b) statement and represent Appellant on appeal. On October 9, 2012, Attorney Watson filed a 20-page concise statement, in which 57 claims were raised. On January 2, 2013, the trial court issued an order permitting Attorney Watson to withdraw as Appellant's counsel as he had accepted a position as an administrative law judge. In that same order, the trial court appointed Mary Bates, Esq. to represent Appellant. On July 2, 2013, the trial court also granted Attorney Bates leave to withdraw as Appellant's counsel. In that same order, the court appointed current counsel, Molly Maguire Gaussa, Esq., to represent Appellant.

Attorney Bates filed a motion to withdraw as Appellant's counsel with this Court on June 6, 2014. For the reasons that follow, and because Appellant has not been abandoned and is currently represented by Attorney Gaussa, we hereby grant Attorney Bates' motion to withdraw.

Attorney Bates is the third attorney to seek to withdraw from representing Appellant since Appellant filed his notice of appeal. However, only Attorney Bates, to her credit, has petitioned this Court for permission to do so. The question arises, however, whether the trial court had jurisdiction, after Appellant filed his notice of appeal, 1) to permit trial counsel to withdraw; 2) to appoint Attorney Watson; 3) to permit Attorney Watson to withdraw; 3) to appoint Attorney Bates; 4) to permit Attorney Bates to withdraw; and 5) to appoint Attorney Gaussa. (Hereinafter, we refer to these orders, collectively, as the "actions of the trial court.") This is because "[j]urisdiction is vested in the Superior Court upon the filing of a timely notice of appeal." *Commonwealth v. Nahavandian*, 954 A.2d 625, 629 (Pa. Super. 2008) (citing *Commonwealth v. Miller*, 715 A.2d 1203, 1205 (Pa. Super. 1998). Accordingly, Pa.R.A.P. 1701(a) dictates that "[e]xcept as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter." Arguably, then, it could be contended that the actions of the trial court were undertaken while jurisdiction was lacking.

However, Section (b) of Rule 1701 provides exceptions to the rule set forth in section (a) of Rule 1701. Section (b)(1) permits a trial court to take

> such action as may be necessary to preserve the status quo, correct formal errors in papers relating to the matter, cause the record to be transcribed, approved, filed and transmitted, grant leave to appeal in forma pauperis, grant supersedeas, and take

other action permitted or required by these rules or otherwise ancillary to the appeal or petition for review proceeding.

Pa.R.A.P. 1701(b)(1).

Here, we believe the actions of the trial court were permissible because they were "ancillary" to this appeal. *See* Pa.R.A.P. 1701(b)(1). Notably, the orders of the trial court did not permit Appellant's attorneys to withdraw under circumstances where Appellant would have been left unrepresented without further action on the part of Appellant or the court. Furthermore, the reasons for the withdrawals did not relate to the claims for which relief is sought. Conversely, when the withdrawal of counsel even arguably implicates ***Anders v. California***, 386 U.S. 738 (1967), ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988), ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. 1988), and/or ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998), the withdrawal of counsel is not an ancillary matter and the trial court is devoid of jurisdiction to permit withdrawal following the filing of a notice of appeal. In such cases, the trial court must follow the dictates of ***Anders***, ***Turner***/***Finley***, ***Grazier***, related cases, and their progeny.

We now turn to address the claims presented by Appellant. In his brief, Appellant presents the following issues for our review:

1. The trial court erred when it considered the testimonial evidence of numerous witnesses who lacked credibility, reliability and the evidence was unsubstantiated; the verdict of the jury is against the evidence when it considered the testimony of the unreliable witnesses.

2. The trial court erred when it denied Defense counsels [*sic*] numerous Motions for Suppression, Motion to Sever, Motion in Liminie [*sic*], and Motion for a Mistrial.

3. The trial court erred in admitting irrelevant and unfairly prejudicial evidence.

4. The Commonwealth did not present sufficient evidence to sustain a conviction on all charges.

5. The trial court erred in allowing the Commonwealth to present prior bad acts through witness testimony.

6. The trial court erred in allowing a non[-]redacted transcript to be reviewed by the jury, thus causing a prejudicial effect.

Appellant's Brief at 8-9.

As a preliminary matter, we address the question of whether Appellant's concise statement complied with the dictates of Rule 1925(b). Rule 1925(b) states, in pertinent part, as follows:

> **(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court.--** If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").
>
> …
>
> (4) *Requirements; waiver.*
>
> (i) <u>The Statement shall set forth only those rulings or errors that the appellant intends to challenge.</u>
>
> (ii) The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge. The judge shall not require the citation to authorities; however, appellant may choose to include pertinent authorities in the Statement.

(iii) The judge shall not require appellant or appellee to file a brief, memorandum of law, or response as part of or in conjunction with the Statement.

(iv) The Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver.

(v) Each error identified in the Statement will be deemed to include every subsidiary issue contained therein which was raised in the trial court; this provision does not in any way limit the obligation of a criminal appellant to delineate clearly the scope of claimed constitutional errors on appeal.

(vi) If the appellant in a civil case cannot readily discern the basis for the judge's decision, the appellant shall preface the Statement with an explanation as to why the Statement has identified the errors in only general terms. In such a case, the generality of the Statement will not be grounds for finding waiver.

(vii) Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.

Pa.R.A.P. 1925(b) (underlined emphasis added).

In *Kanter v. Epstein*, 866 A.2d 394 (Pa. Super. 2004), this Court determined that the appellants waived all of the claims raised in their Rule 1925(b) statements "[b]y raising an outrageous number of issues." *Id.* at 401. We explained:

The Defendants' failure to set forth the issues that they sought to raise on appeal in a concise manner impeded the trial court's ability to prepare an opinion addressing the issues that the Defendants sought to raise before this Court, thereby frustrating this Court's ability to engage in a meaningful and effective appellate review process. *See Commonwealth v. Steadley*, 748 A.2d 707, 709 (Pa. Super. 2000); *see also Commonwealth v. Kimble*, 756 A.2d 78, 80 (Pa. Super. 2000).

By raising an outrageous number of issues, the Defendants have deliberately circumvented the meaning and purpose of Rule 1925(b) and have thereby effectively precluded appellate review of the issues they now seek to raise.

*Id.*

This Court also found that the appellants waived all of the claims raised in their Rule 1925(b) statement for similar reasons in **Tucker v. R.M. Tours**, 939 A.2d 343 (Pa. Super. 2007). In that case, we explained:

> In the case *sub judice*, we conclude [the a]ppellants have engaged in misconduct when they "attempted to overwhelm the trial court by filing [a] Rule 1925(b) Statement ... that contained a multitude of issues that [Appellants] did not intend to raise and/or could not raise before this Court." **Kanter**, 866 A.2d at 402. Appellants' initial court-ordered Pa.R.A.P. 1925(b) statement … consisted of sixteen pages, with seventy-six paragraphs …, plus exhibits. Our review of the statement reveals that [the a]ppellants raised a voluminous number of lengthy issues, which created confusion for the trial court. We conclude that this conduct on the part of [the a]ppellants breaches their duty of good faith and fair dealing with the Court and constitutes a course of misconduct which is designed to "undermine the Rules of Appellate Procedure." **Id.** Accordingly, … we find [the a]ppellants' issues on appeal to be waived.

**Tucker**, 939 A.2d at 346-47.

In the present case, Appellant filed a Rule 1925(b) statement containing 57 issues spanning approximately 20 pages. Many of the issues raised therein contain multiple sub-parts and excessive explanations regarding the alleged errors.[3] Numerous other issues specify the nature of

_____

[3] For instance, some of the claims contained in Appellant's Rule 1925(b) statement reached a full page in length:

*(Footnote Continued Next Page)*

The trial court erred/abused its discretion in denying Defendant's omnibus pretrial motion - Motion to Suppress Extra Judicial Oral Statements as set forth in the written motion, where Troopers Monkalis and Ashton went to Ohio to interview Defendant Duncan and where a statement was alleged to have been given by Defendant Duncan which was never videotaped, audiotaped or reduced to writing, however Trooper Monkalis claims that he took notes and admitted that the notes no longer existed and the alleged notes of Corporal Ashton no longer existed. Trooper Monkalis allegedly asked Defendant Duncan about the alleged homicide and allegedly obtained incriminating responses. Said extrajudicial statements should have been suppressed as there was no evidence of a signed *Miranda* waiver form, Trooper Monkalis was unable to provide a specific date as to when the alleged interview took place other than giving a month and a year, stating on cross-examination that he believed that possibly might have occurred, and Trooper Monkalis claimed that there was a written and executed *Miranda* waiver form then stated he basically said Defendant would not sign anything, the 2 statements being in direct contradiction of each other. The alleged statements and notes of Trooper Monkalis which have been destroyed, are inherently unreliable and Trooper Monkalis contradicted himself through direct and cross-examinations from whether or not he took notes, to whether or not Corporal Ashton took notes and to whether Michael Duncan, the Defendant, said that the deceased was whacked as to hypothetically saying someone owes someone a lot of money. Because of the myriad of contradictions, the refusal to be [*sic*] *Miranda*, the law so notes [*sic*], the inconsistencies of Trooper Monkalis['] report and the unexplainable loss of Corporal Ashton's notes, the inability to know whether Corporal Ashton even took notes and the lack of caution to audiotape, videotape or reduce in writing the alleged interview indicates that the alleged statements lacked the sufficient indicia of credibility to be used at the trial of this matter. The alleged statements of Defendant Michael Duncan are contaminated for all the above reasons and should not have been allowed at the trial of this matter.

Appellant's Concise Statement, 10/9/12, at ¶ 42.

the claim concisely but fail to identify pertinent information such as the location in the record where the claim arose or the particular piece of evidence being contested.[4] Consequently, the trial court "strongly considered applying the doctrine of waiver based on the number and vagueness of issues presented in [Appellant's Rule 1925(b) statement], but decided to address the non-redundant, non-frivolous issues to the best of its ability…." TCO, at 13 n.7.

Although the trial court declined to find waiver, we are not bound by its determination in this regard. "[T]he issue of waiver based on a violation of Rule 1925(b) is expressly reserved to the appellate courts, and not to the trial courts." *Commonwealth v. Donahue*, 630 A.2d 1238, 1242-43 (Pa. Super. 1993). Here, we ascertain that Appellant's disregard of both the spirit and explicit text of Rule 1925(b)(4) is too egregious to be overlooked, despite the trial court's valiant efforts at tackling Appellant's claims in its Rule 1925(a) opinion. Accordingly, we conclude that all of the claims raised in Appellant's Rule 1925(b) statement have been waived for his failure to comply with Rule 1925(b)(4), and we affirm his judgment of sentence on

_____

[4] For example, in his concise statement, Appellant asserted that "[t]he trial court erred/abused its discretion in denying the request for a jury instruction regarding inflammatory photos charged under the circumstances based upon the admission of the photographs introduced by the Commonwealth in this case." Appellant's Concise Statement, 10/9/12, at ¶ 37. However, Appellant's allegation of error failed to specifically identify the contested photographs, such as by listing the photographs' exhibit numbers or simply by describing them.

that basis.[5]  ***See*** Pa.R.A.P. 1925(b)(4)(vii) ("Issues … not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Judgment of sentence ***affirmed***.

Judge Olson concurs in the result.

Justice Fitzgerald files a concurring statement in which Judge Olson joins.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/30/2014

_____

[5] Nevertheless, were we to reach the claims that Appellant raised in his brief to this Court, we would affirm based upon the trial court's well-reasoned Rule 1925(a) opinion.